**CONVISER v. SIMPSON et al.**

**CONVISER et al. v. BRECK et al.**

**Civ. A. Nos. 7028–7052.**

United States District Court
D. Maryland.

May 25, 1954.

Harry O. Levin, Marshall A. Levin, Fred Oken, Philip Heller Sacks, Lawrence B. Fenneman, Baltimore, Md., and Edward Rothenberg, Irving Steinman and Mortimer A. Shapiro, New York City, for plaintiffs.

Venable, Baetjer & Howard and H. Vernon Eney, Baltimore, Md., for defendant Tri-Continental Corp.

Piper & Marbury, Baltimore, Md., William L. Marbury and Frank T. Gray, Baltimore, Md., for individual defendants.

WILLIAM C. COLEMAN, Chief Judge.

The first of these suits, No. 7028, is brought by the plaintiff, David J. Conviser, a resident of Florida, and two intervenors, as a stockholders' representative action on behalf of themselves and all other holders of the common stock of Tri-Continental Corporation, incorporated in Maryland, against that corporation and eight of its thirteen directors. In this suit the plaintiffs seek a decree against all defendants, requiring the abandonment of Tri-Continental's policy of retaining realized capital gains, and also requiring the declaration and payment of dividends to its common stockholders equal to those capital gains realized during the years 1951, 1952 and 1953, less any income taxes paid or payable thereon. The result of such decree would be to relieve the company of an obligation to pay approximately $1,874,-000 as income taxes on its 1953 realized capital gains.

The second suit, No. 7052, is brought by the plaintiff, David J. Conviser, alone, as a stockholders' so-called derivative suit, against Tri-Continental and its thirteen directors, whereby plaintiff seeks to make these directors liable for approximately $3,500,000 which the company paid as income taxes for the years 1951 and 1952, because of its re-

206

tention of realized capital gains in those years, instead of disbursing them as dividends to the common stockholders.

This suit was originally brought in 1953 in the Supreme Court of the State of New York, County of New York, but was discontinued in December, 1953, without prejudice, and brought in this Court in order that there might be a single trial of this action with suit No. 7028, which had first been brought in the District Court for the Southern District of New York against Tri-Continental and eight of its directors, resident in that district.

It will be seen that the ultimate object of both suits is the same. Suit No. 7052 purports to be a so-called derivative action against all directors of Tri-Continental, with Tri-Continental as merely a nominal defendant, since it is plaintiff's effort, by this suit, to require the directors of Tri-Continental to reimburse it for the taxes paid by it on its retained and reinvested 1951 and 1952 capital gains. The two suits were accordingly consolidated for trial.

Tri-Continental Corporation is a so-called "closed-end diversified investment company" within the meaning of the Investment Company Act of 1940 and has been registered as such under that Act since its effective date, November 1st, 1940. That Act defines an "investment company" as "any issuer which—(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; (2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or (3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis." 15 U.S.C.A. § 80a–3.

By the same Act, a "management company" is defined as "any investment company other than a face-amount certificate company or a unit investment trust." 15 U.S.C.A. § 80a–4(3). The Act divides "management companies" into "open-end" and "closed-end" companies, as follows: "(a) * * * (1) 'Open-end company' means a management company which is offering for sale or has outstanding any redeemable security of which it is the issuer. (2) 'Closed-end company' means any management company other than an open-end company. (b) Management companies are further divided into diversified companies and non-diversified companies, defined as follows: (1) 'Diversified company' means a management company which meets the following requirements: At least 75 per centum of the value of its total assets is represented by cash and cash items (including receivables), Government securities, securities of other investment companies, and other securities for the purposes of this calculation limited in respect of any one issuer to an amount not greater in value than 5 per centum of the value of the total assets of such management company and to not more than 10 per centum of the outstanding voting securities of such issuer. (2) 'Non-diversified company' means any management company other than a diversified company. (c) A registered diversified company which at the time of its qualification as such meets the requirements of paragraph (1) of subsection (b) of this section shall not lose its status as a diversified company because of any subsequent discrepancy between the value of its various investments and the requirements of said paragraph, so long as any such discrepancy existing immediately after its acquisition of any security or other property is neither wholly nor partly the result of such acquisition." 15 U.S.C.A. § 80a–5.

Also, since May, 1946, Tri-Continental has qualified as a "regulated investment company" as defined in Supplement Q, Section 361, of Title 26, Internal Reve-

nue Code, 26 U.S.C.A., which entitled it and its shareholders to the tax benefits provided by Section 362 of Supplement Q, which can be briefly stated as follows: if the company pays out to its stockholders as dividends not less than 90 per cent of its net investment income, such income and all realized long term capital gains that it has disbursed are not taxable to the corporation. Such income so distributed as dividends to the stockholders is taxable to them, and such realized capital gains as are distributed are also taxable to them as long term capital gains, at their individual tax rates. But capital gains not so distributed are taxable to the corporation at the capital gain rate of 25 per cent.

This policy of Tri-Continental in retaining realized capital gains has been consistently followed by it, which is the only closed-end regulated investment company which has not made a practice of distributing capital gains to its stockholders. The gist of the plaintiff's contention is that this practice is an abuse of discretion on the part of the directors of the corporation, in that, apart from what may be their real motive in following this policy, it has resulted in undue benefits to certain classes of its security holders at the expense of its common stockholders. The plaintiffs, in support of their position, refer to the fact that for the two years 1951 and 1952 the corporation paid taxes in the amount of nearly $3,500,000 on approximately $13,800,000 of realized capital gains,—a payment which it is asserted was needlessly and wrongfully made, to the detriment of the common stockholders. It is likewise asserted that, if the corporation's present policy is allowed to continue, it will pay additional income taxes on retained capital gains for the year 1953 of approximately $1,800,000 on approximately $7,500,-000 of such capital gains.

In addition to stressing the fact that this policy of the corporation is contrary to that of all other regulated investment companies, including several in which its own directors constitute a majority of the board of directors, the plaintiffs assert and have attempted to prove the following: (1) that the tax loss suffered by the corporation, because of its retention of realized capital gains, is reflected in a detriment to the common stockholders by the discount at which the corporation's common stock sells on the market; (2) that this retention of taxable realized capital gains results in double taxation to the individual stockholder, the avoidance of which is asserted to be a basic reason for the regulated investment companies being accorded special treatment under the Revenue Laws; (3) that it has resulted in further loss to common stockholders through their inability to take advantage of the lower tax rates afforded individuals on long term capital gains, and further to offset any losses suffered from other transactions, both of which would have been available to them if realized capital gains had been distributed to common stockholders; (4) that the corporation's policy is not needed for the protection of its senior securities, nor for the possible refunding of its preferred stock; and (5) that the continuance of that policy is not needed for the protection of outstanding warrants.

Summarized, the contentions of the plaintiffs may be correctly stated as follows: that a policy which establishes a fixed line of demarcation between capital gains and investment income, instead of pooling the two and making a distribution to stockholders from both on the basis of each year's situation, is unreasonable; that it is a device for compelling the stockholder to reinvest his share of the profits in the corporation's common stock, instead of affording him an opportunity to invest distributed profits in securities of his own choosing, or to determine whether he wants to reinvest such profits at all; and that, in any event, whether realized capital gains are to be regarded as profit or as returns on capital, there is no justification for the Company's present policy of retaining such gains as long as

the Federal tax laws treat them as taxable income if not distributed to stockholders.

Summarized, the answers of the defendant corporation and the individual defendants to the above contentions of the plaintiffs are these: that there is nothing inherently wrong about the corporation's well-established policy of retaining its realized capital gains instead of distributing them to the common stockholders; that the law expressly gives them an option,—the right to elect which to do; that the defendant corporation is different from an ordinary business corporation, its purpose being to invest the money of its stockholders to produce income with as much safety to principal as possible; and to protect the principal from the effects of inflation or deflation of the dollar as much as possible; and that, therefore, to regard realized capital gains as true income is, in essence, a fiction; that their retention and reinvestment is the soundest policy for this closed-end investment company with its unusual capital structure of senior securities, debentures, preferred stock, and also warrants outstanding; that with the present policy of 75 per cent of its capital gains being retained by the defendant corporation, those gains are put to work, so to speak, for the benefit of the common stockholders, whose stock is worth many times the warrants; that the corporation does not hold out its stock as being attractive to all classes of investors, it being admittedly more advantageous for some investors to invest in the stock of open-end investment companies, or in closed-end companies which do not follow the policy of this corporation; that it is a question of individual preference or need; and that it is the long-term investor that the directors of the defendant corporation primarily aim to please.

After hearing lengthy testimony and examining the voluminous exhibits introduced in connection with this testimony; after reading the briefs and hearing argument of counsel, the Court reaches the conclusion that what has been presented on behalf of the corporation and its directors shows, by the overwhelming weight of the credible evidence. the correctness of their contention that the plaintiffs have not proved their case but, on the contrary, that their claims are baseless, insofar as the credible testimony is concerned. In other words, we find (1) that the corporation's policy of retaining realized capital gains does not represent an abuse of discretion on the part of the directors, or that it results other than to the benefit of the common stockholders; and (2) that the directors have done nothing to render them personally liable to the corporation, and there has been no injury to it.

About 2,000 shares only of Tri-Continental common stock are held by the present plaintiffs, whereas there are four million of such shares outstanding,—in other words, only approximately 1⁄20 of 1% of the common stockholders are really represented in the present suits. There are 20,306 individual holders of the common stock of the corporation. The average individual holding is 205 shares. 8,364 persons own 100 shares or more, and the remaining 11,942 own less than 100 shares. Each year since 1945 the total dividends paid by the corporation have steadily increased from approximately $1,334,000 in that year to nearly $7,000,000 in 1953. During the same period a yearly $6 dividend has been paid on the preferred stock, and the dividends on the common stock have increased from 20 cents to $1.11 in 1953. Also, during the same period the investment net income has increased from something over $1,000,000 in 1945 to nearly $7,000,000 in 1953. These figures certainly indicate a healthy condition of the corporation. Of course, it is true that the real worth of the common stock is to be determined in terms of net assets of the corporation, and on this the testimony shows a most satisfactory situation also. However, the plaintiffs still contend that the stock market value reflects too great a discount below the actual net asset worth of the stock.

What, in the last analysis, are the plaintiffs really asking for? It seems to the Court that they are, in effect, claiming that it is mandatory upon this corporation, by virtue of the provisions of the tax law governing realized capital gains, to make the distribution here contended for. Plaintiffs do not actually claim that. In fact, they must deny it, because the defendant company and its stockholders are simply exercising an option which the law expressly gives them. Nevertheless, plaintiffs stress the fact that other companies, similarly constituted, and working under the same law, do distribute their realized capital gains. But the other companies with which Tri-Continental has been compared do not have the same capital structure as respects senior securities. The position taken on behalf of Tri-Continental is that good business judgment requires that its management should very carefully protect its senior securities, namely, that it should have a sound refunding policy; that at the present time, it has under consideration a plan for refunding its preferred stock at a lower dividend rate, thus improving the position of the common stockholders; that the company's charter requires 200% reserve against the preferred stock before dividends may be declared on the common stock, and that this denotes the advisability of not disbursing realized capital gains. It is contended that under the company's present policy of not distributing capital gains, these gains work to the great advantage of the common stockholders, by investments made for their benefit. It is to be noted that while this policy was announced as early as 1945, it received no complaint from any of the plaintiffs until 1953.

Four members of the defendant company's board of directors testified in support of the soundness of the board's position,—the element of caution and prudence upon which it is based, in the interest primarily of the long time investor, whom the company mainly aims to serve,—not the investor who wants quick profits. These directors are individuals of the highest integrity and standing in their particular financial fields, and, also, in the important civic work which they do in their respective communities. In fact, this Court has rarely, if ever, had the privilege of hearing, in a single case, a group of men of any higher reputation, or who appeared to be of any higher standing as respects character and ability, or more sincere and convincing in their testimony as to what they have understood to be their duty to the investing public and how they have attempted to perform it,—a duty with respect to the investment of many millions of dollars, made by many thousands of individuals. In addition, the Court has heard testimony from a member of one of the oldest banking houses in the country. As opposed to all this, there is a dearth of plaintiff testimony by persons with current experience in the same financial field. As the Court observed, in the course of argument of counsel, "If it is obligatory, as claimed, upon the defendant corporation to make distribution of its realized capital gains, as is being done by other similar investment companies, it is strange that no testimony has been given in the present case by officers or directors of even one of' those companies."

Finally, there is no proof that the firm of J. & W. Seligman & Company has dominated Tri-Continental so as to destroy or prevent unbiased, sound, independent business judgment on the part of its management. We find no misconduct or self-dealing, as plaintiffs claim, through alleged domination by the Seligman firm of Tri-Continental since its organization. Since 1942, four years before the policy here complained of was adopted by Tri-Continental, not more than three members of the Seligman firm have served at any one time as Tri-Continental directors. The character and standing, coupled with the varied and most substantial business connections of the individual directors of Tri-Continental, indicate that they are not given to surrendering their independent judgment.

**210**

For the foregoing reasons, both complaints must be dismissed, and we deem it unnecessary to consider any of the other questions that have been presented, or to analyze any of the decisions to which plaintiff has referred. None of them, we believe, lays down any principle which is contrary to what we have here applied.

An order will be signed in accordance with this opinion.